UNITED STATES of America, Appellee,

v.

Paul A. GROVES, Jr., Appellant.

No. 77–1116.

United States Court of Appeals,
Ninth Circuit.

Feb. 15, 1978.

Rehearing Denied March 20, 1978.

Thomas W. Hillier, II (argued), Seattle, Wash., for appellant.

Jack Meyerson, Asst. U. S. Atty. (argued), Seattle, Wash., for the United States.

Before BROWNING, KILKENNY and TRASK, Circuit Judges.

KILKENNY, Circuit Judge:

Appellant was convicted in a court trial of violating 21 U.S.C. § 846 [conspiracy to distribute marihuana], 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B) [possession of marihuana with intent to distribute], and 18 U.S.C. § 2 [aiding and abetting]. We reverse.

## BACKGROUND

Briefly stated, the record and stipulated facts reveal an ongoing investigation of marihuana trafficking between California and Canada by agents of the Drug Enforcement Administration [DEA] from November of 1975 to January of 1976. On January 2, 1976, one of the DEA agents received a phone message from a reliable informant stating that a Chevrolet Pickup bearing a California license and a Ford Pickup bearing a British Columbia license were at a certain Bellingham, Washington, residence, a suspected location for unlawful traffic in narcotic drugs. The agent was advised that the occupants of the vehicles, a male and possibly two females, were moving boxes about in the vicinity of the pickups. Some time thereafter, a Washington State Patrol unit observed the Ford Pickup moving northbound on Interstate 5 approximately five miles south of the Canadian Border. After a stop of the vehicle by the state patrol, two special agents of the DEA proceeded to the location of the vehicle and found a substantial quantity of marihuana.

On the same afternoon, based on substantial information received from the driver of the Ford Pickup and others, a search by special agents was made of motel parking lots in Bellingham for the Chevrolet Pickup bearing the California license. The vehicle was located at approximately 9:30 that evening in front of a bungalow at a Bellingham motel. Appellant was in the bungalow and when asked for identification by the agents, he voluntarily handed over his wallet. When one of the agents looked inside for identification, he recognized a bindle of the type which is routinely used to carry contraband drugs. When a small quantity of cocaine was found therein, the appellant was placed under arrest and advised of his constitutional rights.

Later, on January 5, 1976, an agent drove the appellant to the place of his preliminary hearing before a Magistrate. When asked by the agent to cooperate with the government, the appellant indicated his willingness and agreed to discuss the matter with the agent after the hearing. At this hearing, the appellant was informed that a complaint had been filed [in fact the complaint was not filed until January 5th] charging him with possession of cocaine in violation of 21 U.S.C. § 844(a). After also being advised of his rights by the Magistrate, the appellant's bail was set, as was the arraignment date. After this occurred, the appellant was then taken to the Blaine District Office where he was further interviewed in connection with his involvement in the marihuana smuggling. He then confessed his overall participation in the marihuana scheme, and the agent solicited his cooperation in making a case against one Padilla, the ringleader of the gang in California who supplied the marihuana. The appellant understood that he would not be charged with the marihuana offense and

that his cooperation would result in the dismissal of the cocaine charge. On the representation of the appellant that he could identify the source of the marihuana supply, the agent contacted Special Agent Alexander in San Diego and informed him of this fact. Appellant was then released from custody and returned to California.

The following day, January 6, 1976, the appellant advised the San Diego agent that, through fear of his life, he would not testify against his source of supply before either a Federal Grand Jury or in a trial, although he would furnish his supplier's name and address [which he did]. On the same day, the appellant made a trip with the officers and identified the residence of the ringleader. On January 13th, the appellant refused to identify another individual whom he knew was involved in the smuggling scheme. On January 21st, following the arraignment on the cocaine charge, there were other discussions with reference to participation, but the appellant gave no additional information.

From a review of the records and files, we are unable to discover any significant occurrence during the time period from the day of the preliminary hearing on January 5, 1976, through October 4, 1976. On the latter date, counsel for appellant asked an Assistant United States Attorney for a dismissal of the cocaine complaint pursuant to the provisions of the Speedy Trial Act, 18 U.S.C. § 3161(b). On October 6th, the United States Attorney advised appellant's counsel that the cocaine charge would not be pressed. Then, on October 12, 1976, the felony indictment mentioned in the opening paragraph was returned against the appellant. Appellant sought formal dismissal of the cocaine charge on October 20th on the ground that the Speedy Trial Act was applicable. Thereafter, on October 27, 1976, the government moved and secured an order of dismissal of the cocaine complaint pursuant to the provisions of Rule 48, FRCrimP.

On December 27, 1976, after a hearing, the district court denied the appellant's motion to dismiss the marihuana indictment on the ground that it was based on a vindictive prosecution; the court found that it was not a vindictive prosecution, but the result of the appellant's failure to cooperate. Ruling was reserved on the appellant's motion to suppress the statements he had made to the DEA agent. Later, on December 29th, the court continued the hearing on the motion to suppress. During the course of that hearing, the United States Attorney and the appellant and his attorney concluded to try the cause before the court and entered into a purported stipulated agreement of facts. The appellant was convicted.

The only reason for the filing of the indictment is contained in an affidavit of Assistant United States Attorney Meyerson:

"Between October 4, 1976 and October 6, 1976, I spoke with Special Agent Alexander in San Diego concerning the extent of Groves' cooperation. Alexander indicated that other than the initial contact on January 6, 1976, Groves had not performed his part of the bargain and that there had been no additional assistance provided by Groves other than merely naming his source and indicating where he lived. Based upon the conversation with Alexander, I determined that Groves had not complied with his terms of the bargain and accordingly decided to pursue felony charges against him.

"On October 6, 1976, I spoke with Mr. Hillier [appellant's counsel] and indicated that I felt there was nothing in the Speedy Trial legislation that prevented me from pursuing felony charges against Mr. Groves. I explained that the basis for pursuing felony charges against Groves was the fact that he had not satisfactorily fulfilled the terms of our pre-indictment agreement . . ."

These statements make it perfectly clear that the appellant's assertion of a statutory right to dismissal of the cocaine charge triggered the discussion between Meyerson and Agent Alexander, which in turn resulted in the marihuana indictment.

## VINDICTIVE PROSECUTION CLAIM

Appellant's principal contention is that the district court failed to recognize the

obvious due process violation occasioned by the action of the United States Attorney when he obtained the marihuana indictment. Specifically, he claims that this is the kind of [prosecutorial] vindictiveness proscribed in *Blackledge v. Perry*, 417 U.S. 21, 94 S.Ct. 2098, 40 L.Ed.2d 628 (1974), and *North Carolina v. Pearce*, 395 U.S. 711, 89 S.Ct. 2072, 23 L.Ed.2d 656 (1969).

In analyzing *Blackledge* and *Pearce*, we held in *United States v. Ruesga-Martinez*, 534 F.2d 1367 (CA9 1976), that when the prosecution has occasion to reindict an accused because the accused has exercised some procedural right [such as appellant's right to move for dismissal on the cocaine charge under the Speedy Trial Act], the prosecution bears a heavy burden of proving that any increase in the severity of the *alleged charges* was not motivated by a vindictive purpose. *Id.* at 1369.

Here, the undisputed record shows that on January 5, 1976, the appellant made a complete confession of his complicity in the marihuana trafficking from California to Bellingham and other areas. At that time, there was an agreement under which the appellant made a promise to cooperate [the details of which are disputed]. The following day, on January 6th, the appellant was interviewed by Agent Alexander to whom he revealed the name [Padilla] and address of the California source. He told the agent at this time that he would not testify before a grand jury, nor during the course of a trial. This refusal was apparently reiterated on January 21st, the date of his arraignment on the cocaine charge. These statements, plus the appellant's negative action on January 13, 1976, make his intent unmistakable.

Moreover, we have discovered nothing in the months after January of 1976 which would allow for any contrary belief by the government. They knew in January of 1976 that appellant would cooperate only to the extent of giving the name and address of the person who was the principal source of supply. Now, however, the government relies upon this "failure to cooperate" to justify the filing of the felony indictment in October of 1976 [eight days after appellant's counsel raised the Speedy Trial Act issue]. The fact that the information supplied by appellant did not measure up to the desired result or satisfy the government is of no relevance on the issue here presented.

This coincidence of events presents overwhelming circumstantial evidence that the indictment was returned and filed in retaliation for appellant's suggestion that the Speedy Trial Act barred prosecution on the cocaine complaint. With full knowledge of the appellant's violation of the marihuana laws and the extent of his cooperation in January, the government did not see fit to seek the indictment until shortly after the appellant had asserted his statutory rights.

Here, the district court found that there was no vindictiveness and that the indictment was returned because appellant failed to live up to his promise of cooperation. The district court, however, did not make a finding on the "appearance of vindictiveness" that so clearly appears from the filing of the indictment in October of 1976. We hold that the manifest appearance of vindictiveness thus created brought into play the *Blackledge* line of cases.

We need not find that the prosecutor acted in bad faith or that he maliciously sought the marihuana indictment. The core of the *Blackledge*, *Pearce* and *Ruesga-Martinez* decisions is that it is the *appearance of vindictiveness*, rather than *vindictiveness in fact*, which controls. The logic behind the rule is fully explored in those decisions and more recently in the very important case of *United States v. DeMarco*, 550 F.2d 1224 (CA9 1977), where the court noted that "apprehension of vindictiveness" and "appearance of vindictiveness" are adequate to bring a case within *Blackledge*.[1] *See also Midgett v. McClel-*

---

1. As stated in *DeMarco*: "It is irrelevant that a particular defendant exercises his statutory rights, despite his fear of vindictiveness and despite the lack of vindictiveness in fact in subsequent proceedings instituted by the prosecutor. The prophylactic rule is designed not only to relieve the defendant who has asserted his right from bearing the burden from 'upping

*land*, 547 F.2d 1194 (CA4 1977); *Hayes v. Cowan*, 547 F.2d 42 (CA6 1976); *United States v. Johnson*, 537 F.2d 1170 (CA4 1976).

The government also argues that the *Blackledge* line of cases should not apply in the first instance inasmuch as this case involves different crimes relating to completely separate fact situations. Its contention is that the *Blackledge-Pearce* line of cases is to be distinguished because two separate and distinct cases are here involved. We disagree, but do not regard this factor as controlling in any case. The government concedes that it had the marihuana operation under surveillance for a number of months prior to the arrest on January 2nd. It is crystal clear that the seizure of the marihuana near the Canadian Border led directly to the interrogation of the appellant. In response to the agent's request for identification [in this marihuana investigation], the appellant turned over his wallet in which the cocaine was discovered. Thus, the two statutory violations were so interrelated that there would never have been a cocaine charge in the first instance were it not for the marihuana investigation. Both crimes, in short, grew out of the same set of facts.

The record before us is closely akin to that before the court in *DeMarco, supra.* There, the defendant was indicted in the District of Columbia in connection with his activities relating to preparation of former President Nixon's income tax returns. The defendant moved to change the venue to the district of his residence in California. The motion was granted. The district court found that after the motions were granted, the prosecutor told defendant's counsel that the government was considering filing a motion for reconsideration and that if the · case was transferred to California, the government would consider more counts against the defendant. The defendant insisted on his venue rights and the case was transferred to California. Shortly thereafter, the government obtained a second indictment in California which added a new charge, albeit based upon essentially the same facts as the initial indictment. In *DeMarco*, the government argued that *Blackledge* was to be distinguished because the first and second indictments were not based on identical facts. The court rejected this argument there too and emphasized that "[t]he factual nucleus of both indictments was the same." It also noted that "[e]ven if the first and second indictments were not based on facts that were so similar that a trial on one would have prevented trial on the other upon double jeopardy grounds, that situation would not distinguish this case from *Blackledge*." 550 F.2d at 1226–27.

We adopt this reasoning and do not regard the factual similarity/dissimilarity of the two charges as dispositive on the question of vindictiveness; rather, we regard it as only one of the factors bearing on the issue. Cf. *Ruesga-Martinez*, 534 F.2d at 1369. While the actions of the prosecutor in *DeMarco* were not as subtle as those of the prosecutor in the case before us, the fact remains that the government forgot about the marihuana case against the appellant in January of 1976 and did not resurrect it until after the appellant had exercised his statutory right to get the cocaine charges dismissed. In urging that the new charges were based upon the appellant's failure to cooperate, the government ignores the fact that the appellant took the same position in January of 1976 as he took in October of 1976 [when the marihuana indictment was filed]. Moreover, the government knew all of the facts relating to the marihuana charge on the same day that the cocaine complaint was filed. The record is utterly devoid of any evidence that the government relied upon any promise of the appellant after January of 1976. The conclusion is inescapable on this record that the government brought the marihuana charge in retaliation for the appellant's exercise of his statutory rights on the cocaine charge.

the ante' but also to prevent chilling the exercise of such rights by other defendants who must make their choices under similar circumstances in the future." 550 F.2d at 1227. This same holding is found in *United States v. Alvarado-Sandoval*, 557 F.2d 645 (CA9 1977).

*United States v. Gogarty*, 533 F.2d 93 (CA2 1976), cited by the government on the question of appellant's failure to cooperate, is far afield. It does not even involve an allegation of vindictive prosecution. There, the defendant entered into a formal written agreement with the prosecution in which he made a number of specific promises. The substance of the holding in *Gogarty* is that a defendant who is a party to a *deferred prosecution* agreement may not invoke the agreement against the government if he has violated the agreement. The defendant there had breached the agreement himself and had no contractual right not to be prosecuted. In *Gogarty*, there was clear cut evidence that the agreement had been violated on a number of occasions. Here, there is no formal agreement. For that matter, the appellant claims that he did fully cooperate in accordance with [his understanding of] the agreement, while the government claims that he violated the agreement in refusing to appear before the grand jury and testify at a trial. If, in fact, these conditions were a part of the agreement, the government was advised of the appellant's refusal to comply with them in the month of January and yet did nothing until October. When this evidence is combined with the fact that the government at no time expressed any dissatisfaction with the appellant's cooperation [from January to October], it becomes clear that it was not relying upon the breach of any such agreement to justify the felony indictment against the appellant. We hold that the government failed to overcome the appearance of vindictiveness so manifest on the face of this record.

Nor can the government receive any comfort from the recent Supreme Court decision in *Bordenkircher v. Hayes*, —— U.S. ——, 98 S.Ct. 663, 54 L.Ed.2d 604 (1978). There, the Court carefully contrasted increased charges resulting from a failure to reach a plea bargaining agreement with those initiated in response to a defendant's assertion of his legal rights. The Court held that a "unilateral imposition of a penalty upon a defendant who had chosen to exercise a legal right . . . [was] 'very different from the give-and-take negotiation common in plea bargaining between the prosecution and the defense . . .' " [Citation omitted]. Here, both the government and the appellant had long since completed negotiations on the plea agreement. Moreover, each side had completed its part of the bargain by the time the government secured the indictment, the basis of this prosecution. Inasmuch as the government sought unilaterally and vindictively to punish the appellant for assertion of his legal rights, *Bordenkircher* is a support rather than a bar to the reversal of this conviction.

## CONCLUSION

The case must be reversed and the indictment dismissed.

IT IS SO ORDERED.